Terry Kizer Cooper for Tammy Evans I'd like to reserve three minutes. The magistrate dismissed three claims mid-trial that should have gone to the jury and never did. I want to simplify why that was error. First, Tammy Evans' claim against Sue Auerbach. This claim is about process. This is about Tammy Evans' right to a fair, impartial, even-handed investigation. Evans' claim is that Auerbach's investigation was a cruel farce. It was rigged to reach a predetermined result. And it was intended to whitewash the City of Sparks. One and a half years before this case went to trial, the magistrate denied summary judgment to Sue Auerbach. And he went on at length as to how this case was similar to the Fuller case. We've discussed that in our brief. I don't want to discuss it here. I want to talk about another case in which the court looked at whether or not an investigation was conducted in bad faith. And that's the Swenson v. Potter case. Before you get to that, I'd like you to tell me, if you can, what evidence there was in the record that her motivation was gender-biased. Well, the inferences that were created in Fuller were identical here. In Fuller, they looked at whether or not the investigation was done in bad faith, whether it was timely, whether the wrongdoers were interviewed, whether there were one-sided resolution of the facts, whether all the facts were resolved against the plaintiff or not. Those things equated to or created an issue of an inference of gender bias. It's such a woefully inadequate investigation that there's no other reason to explain it other than bias. Or that she believed the person that she talked to. That was her explanation, wasn't it? No. Her explanation was that she could not interview them because she accepted Evans' allegations as true, so she didn't need to go to the officers. That was her explanation. She said there's no other explanation except that it's gender-biased. Well, that was her explanation. It was nothing to the contrary. And so either you believe that or maybe she was just incompetent. How do you jump from there to gender-biased? Because it was so incompetent that a reasonable jury could look at it and conclude that she was putting her head in the ground, that it was so bad. In other words, the facts that were coming out in the investigation were so egregious. And she knew how bad it was for Evans. Well, she said, look, I'm willing to accept that they said this, but I thought, because they didn't say it in her presence, it was not hostile environment. That was her reason. So I don't need to talk to them because I am assuming that, compared to telling the truth, I'm assuming that they, in fact, said it. But that's how I read the law. She was wrong on the law, and her investigation was completely inadequate. But you're wanting us to make the leap that that showed that she had a gender-biased motivation. Well, it's the same thing in Fuller. It's very similar to Fuller. The court made the leap there. It looked at all the things that the investigator did and said that they were so bad it created an inference. Here, that's just one thing that the investigation did. She concluded that there was no sexual harassment, wrongly, because the comments were made outside the plaintiff's hearing. She's not a lawyer. Is the fact that Sue Utterback is a woman, does that factor at all into this equation? Sue Utterback is biased against women. That's what you're asking us to assume. No. We're saying that Sparks is a very small city, that all of the people that run it are men. All the people involved in this are men. She is the lowest on the rung. There was a tremendous urge or a tremendous necessity to be one of the boys and to go along with it. In addition, this case implemented the entire command structure at the city of Sparks, all men. Seven out of the 11 command officers were implicated in this name-calling. It would have been horrific for Utterback to have concluded that there was a real problem here. In fact, everyone was going along with this, with the city of Sparks. Everyone was putting their head in the ground. So she was scared to do the right thing. That's correct. And that's the same thing as gender-biased? Well, it creates an inference. If she was that scared to do the right thing when the right thing was so obvious, she wouldn't interview. She's doing an investigation on whether or not there's name-calling, and she refuses to interview the seven officers identified as calling names. That's so off-the-charts inadequate. She knows that the name-calling occurred. She says it could be a violation of the Sparks policy. She says it's bad conduct. She says as soon as bad conduct is identified, corrective action has to take place. How could corrective action take place as soon as this bad conduct is confirmed, if she refuses to talk to the people involved? That is off-the-charts bad faith, and that is the kind of conduct that was identified in court. I'm sorry. What would she have found out if she had talked to them that was different, or would have made a difference? Let's say she had talked. What difference would that have made? Well, we're saying that's only one of the things that she did wrong. We think that her not talking to them. But you say it is wrong. All right. Now I'm asking you to explain to me why it's wrong, what difference it would have made. She said, at her back said at trial, that it wouldn't have made any difference if these people had admitted to it, that her mind was made up. We're saying that an investigator that goes into that kind of process has predetermined the outcome. Well, because she may have had a mistake about what hostile environment was, not because I'm against women or gender-biased. She was confused as to what the law was. And she reached a predetermined result. That necessarily could be gender-biased. We're saying that all of these things. Why would that have been changed in any way if you had actually gone and talked to them? And they said, yeah, we did it. We did it. She says, well, I assume that was true. It doesn't make any difference to me because, as I understand the law, she wasn't you said when she wasn't there, so it doesn't make any difference. You want to focus on the not talking to them because that's sort of the But you say it's a factor. Yes, it's one factor among four factors that Sutterbeck did. But explain to me why it's a factor that matters in this case. It may have mattered in Swenson. But in this case, since she assumed the worst about the declarants, I understand how it counts against her that she didn't actually talk to them and confirm the thing that she assumed. Because she said the corrective action needs to be taken as soon as wrongdoing is confirmed. She confirmed wrongdoing, didn't want to talk to the people alleged involved in it. There's no way to correct wrongdoing if you don't talk to the people who are involved in the wrongdoing. I thought she was doing an investigation and not the discipline. I mean, the discipline happens after you conduct an investigation and determine that and then you may need to talk to people to tell them to cut it out or whatever. But that's a different step in the analysis, isn't it? Not if you have an open mind. Not if you're impartial. If you're impartial and your eye is to go along with the policy, which is to protect the employee, you want to look open-mindedly, even-handedly, impartially at what's going on in the workplace. Let's say she does make a wrong conclusion that it doesn't violate the policy, that even if they admit to calling Tammy Evans these egregious names, it doesn't violate the policy. She says it's bad conduct and it has to be addressed. We're saying that her failure to interview them shows she has no desire to even remotely contemplate addressing or recommending addressing it because her mind is so made up. Her decision, her focus is right there narrowly at the ground. I can proceed with some of the other things she did. Go ahead. Okay. In Swenson, for example, the employer there showed a lot of concern for the female complainant. Utterback testified that even if Evans did not know who was calling her names, it was still a problem for her and it was a problem that should have been addressed. Now, we know that, and it was all submitted at trial, the interviews with the ten men who went on at length about how Evans was called this from time immemorial, all these bad names. She knew, and Utterback testified, she knew that Evans went to work every day after reading the report she wrote confirming all this name calling and knowing that she was called these sexually derogatory names. Utterback knew that Evans was very offended. She knew that Evans would have no way of knowing whether or not this conduct was continuing. And Utterback said she had no idea if the name calling was continuing. And the difference with Swenson is the concern that the investigators showed. In Swenson, they customized the schedule for the female to minimize contact. They took all of these actions to make sure. They separated the person who was complaining from the alleged harasser. They warned the harasser this could be sexual harassment keep away. They took these steps to make sure there was minimum contact and the employee felt good about at least the process. There was no evidence that the investigation was in bad faith. Even though they concluded that they couldn't sustain a charge of sexual harassment, there was no evidence that the investigation was in bad faith. It's like it's Sir, other than the fact that she didn't interview the four, what else do you have that shows bad faith here? Okay, Sue Utterback concluded that name calling was not an everyday occurrence, so it wasn't really important. At trial, she testified she never asked one officer how often they heard Evans called names. But she concluded it didn't happen every day. She concluded the name calling did not interfere with Evans' ability to do her job. On the stand, she admitted she never asked Evans in the one time she met with Evans whether it interfered with her ability to do her job. She concluded in her report it was not severe or pervasive, but Evans said in her complaint that this was long-ignored conduct, and Utterback admitted that she never asked for one example. She didn't want to be concerned with what was going on in Evans' work environment. Unlike in Swenson where the harassment ended as a result of what the employer did, in Evans, Utterback's refusal to recommend anything be done permitted the harassment to continue. The same men, the same seven men identified as calling Evans names were the same men principally involved in this letter writing campaign to get Evans fired from her job, undermine her authority. I can speak a little about ratification or I can go on to something else, whichever the court would prefer. Well, I'm interested in also the issues that did go to trial. I gather your complaint is that there was instructional error? No, we're claiming that at the Rule 50 time, the court throughout dismissed the co-worker harassment complaint. It's part of retaliation. We're saying that there were two issues of retaliation, two separate claims, and the court dismissed one claim entirely. It didn't word the instruction differently. It just said we're not going to hear that. We're not going to instruct on it. We're not going to hear it, and rejected our instruction. Well, isn't that instructional error? Well, it could be. We're saying that it was a dismissal of the claim. We know that that claim, under the Voorhees case, we know that the claim was well preserved all throughout. It was argued extensively in trial briefs and motions in limine. All the evidence about it came in at Rule 50. But then she was asked whether the instructions were adequate. She said she had a problem with some of them, but then she said the rest of them were okay. She said that the except with the instructions that the court is not going to instruct on. It was not clear. We certainly concede that it was not clear what was said during that instructional period. Tell me exactly which issues went to the jury and were denied. Hostile work environment and constructive discharge. And retaliation as to whether or not the jury found it was retaliation for Evans to be prevented from disciplining the disrespectful officers. And the jury decided against Evans on all three of those claims. Now, what issues do you think should go to the jury if we were to send it back? We think the claim against Sue Utterback should absolutely go to the jury. We think we meet the Fuller test in every way. We think that ratification goes to the jury. Ratification by? The city of Sparks. Right. Ratification consists of, as you know, and we're saying that the policymaker, the city manager for Sparks, which was Terry Reynolds, he knew about Utterback's report and he knew the basis for it and he approved of it. Now, as a policymaker, he made a deliberate choice to endorse her actions from among other alternatives. He chose to let Utterback's report stand. He testified his first thought was, hey, she's not getting to the bottom of this and we need to have another independent evaluation, investigation. And then he said, nope, nope, not going to do that because the city wants to take a defensive posture. And defensive posture means they thought she was going to bring a lawsuit. Had they done the right thing, she never would have brought a lawsuit. I thought it was the other way around. No. Oops. Go on. That he was going to order a misdemeanor and she filed a lawsuit. No, no, no, no. The timing of it was January 25th, 1999. Sue Utterback's report came out. And two days later, Tammy Evans wrote a letter to Terry Reynolds and said, and she copied it to Sue Utterback. She said, I'm horrified that the city has confirmed these remarks in the workplace and intends to do nothing about it. Please meet with me. Please talk to me. I respectfully want to talk with you about this situation. Please do something about it. There was no comment. There was never any comment, never any response. And about two weeks later, she filed a lawsuit. That's how it came out. That lawsuit never would have been filed if they had met with her and talked with her. Does Reynolds explain why, in your words, he didn't meet or talk to her about this? He said it wasn't his job. He said he didn't have to. And then he was questioned as to, well, whose job was it? And he said it was Sue Utterback's job. And Sue Utterback just said, you know, her work was done. She didn't need to meet with Evans. And that's one thing that the city of Sparks says, and it had a comprehensive plan, and that they really, even though they let Sue Utterback's report stand, they had a comprehensive plan to remedy her work environment. And we discussed that at length in our brief, but the one thing we didn't discuss that I want to make sure I tell you about is that if they had a comprehensive plan to remedy her work environment, they would have told her. They never met with her. The city never at any time after Sue Utterback's report met with her and said, we're going to do this for you, we're going to do that for you, we care about what's going on, we want to protect you from all of this. Nothing. They never met with her, ever. And I'd just like to real briefly discuss the cross-appeal in this matter. Sparks claims that Evans is not entitled to attorney fees for injunctive relief because the relief obtained was allegedly de minimis. This couldn't be further from the truth. Evans obtained three out of the five items that she asked for, two of them directly, and one the court slightly reframed. This is mandatory injunctive relief. First, she got relief and the ability to discipline those disrespectful officers. Secondly, she got the right to stay away from this teen building, which the teen building she construed as an opportunity to go in and make friends with guys that were calling her these horrible names. It was like, felt like she was being raped and it was like she had to go out and build a team with her rapists. But the third one, that Evans asked for the court to order Spark to cease and desist from condoning or encouraging employers to engage in conduct that violated the policy. And the court reframed that request for relief and gave almost identical relief and said, it ordered Sparks to issue a formal statement prohibiting sexual harassment and to distribute that policy. I could talk about co-worker harassment, but I've got a few minutes saved. Actually, a minute and 11 seconds. Pardon? It's a minute and 10 seconds. We'll hear from the other side now. May I please record my name is Alice Mercado and I'm here representing the city of Sparks in Sioux-Utter Bath. Your Honors, as I sat at the council table and I'm listening to your questions, I think it's very important to address some of the issues that have been raised already. Excuse me. In my brief, I had laid out basically what they were saying Sioux-Utter Bath did wrong and what the facts actually showed. And it's amazing to me that I'm listening to just the opposite of what's actually in this record. Sioux-Utter Bath explained why she did what she did. One of the questions that you asked, Judge Kuczynski, was what if she would have asked these guys, what would have been the outcome? She says, I was convinced that what Evans said in her memorandum, I accepted that. And if those guys had told me, if I had gone and talked to them and they had said, no, I didn't, I wouldn't have believed them, I would have believed Evans. So in that respect, we're already different from Fuller. I mean, the efforts to make this case into Fuller have been tremendous from the very beginning. And it started with John Dotson, the chief of police, because, of course, those facts fit much better because you've got an IA investigator and a chief of police. Well, those didn't work with regard to Chief Dotson. So now our focus is on Sioux-Utter Bath. Sioux-Utter Bath is a woman, and I think, Judge Trotted, it does make a difference because you're dealing with a woman. Ms. Kaiser-Cooper makes the comment that Sioux-Utter Bath, it was important to her to be one of the guys. We're talking about a 60-plus-year-old woman who's a grandmother who's been working in HR. She's not part of the police administration. That makes her difference, and I think that's what the magistrate judge focused on as well. She's not part of police administration. It doesn't matter to her. This is also a woman that during the trial, it came out that she had investigated other police officers and found against them. If she's trying to be one of the boys, then she would always find in favor of the officers and against the complainants. That didn't happen in this case, and that was evident during the course of this trial. What do you make of the fact that here she finds that, in fact, these comments are being made, are made pretty pervasively, and then she sort of throws up her hands and says, well, there's nothing we can do about it. There's nothing we need to do about it. She doesn't recommend that somebody go talk to those guys or discipline them or tell them to cut it out or adopt a policy of appropriate language or appropriate conduct or anything. I mean, none of the steps that you would think should be taken to prevent this. Now, she may have thought, well, because she was confused about the law, that in this case, it wasn't said in her presence, so there was no harassment. We know she's wrong about that, but let's say that was her view. But surely if they're saying that kind of thing in the workplace, the next time they're going to say it in front of her or they're going to say it within earshot or they're going to think she's out of the room or she's somewhere else and they're going to say it, they're just going to hear it. So why isn't her lack of concern or her lack of initiative to prevent future problems, which is at least half of four, not just punishment, let's say she says, okay, there's nothing we can do about the past conduct and let's say she's reasonably mistaken about that, but surely she must see that this is not going to lead to good things if it continues. And there are several reasons, Judge Kosinski, why she did that. When Sue Utterbatch started this investigation, she was given a memorandum by Chief Evans or Lieutenant Evans at the time that memorandum focused on the summer of 1998. They talked to Evans and they asked her, you know, are you looking to, are you wanting us to look into other areas? And she said, no, I just want you to determine if this happened, I want you guys to do something about it. She gave them witnesses. They would follow those leads. Those leads didn't go anywhere. Nobody ever corroborated anything. What does it mean didn't go anywhere? She would talk to, for example, the very first person that Evans mentioned was a person named Dale Richardson. And even though she said Dale doesn't know anything, but he may have heard anything, so they went to go talk to him. Whose name went to go to him? Oh, I'm sorry, Utterbatch and Lightfoot. This was a co-investigation. They would bring them in and they would talk to them, they would talk to those people, and then if that person provided some information, they would go talk to the next person. One of the people that's mentioned in Chief Evans, or Lieutenant Evans, I'm sorry, report, was this guy named Steve Fiore who allegedly heard three or four officers talking about Lieutenant Evans. Well, they go to Fiore and he doesn't corroborate. They, meaning Utterbatch and Lightfoot. Utterbatch and Lightfoot. They sit with him, they go through him, and during the trial, Your Honor, we went through every witness that Lieutenant, I mean, Utterbatch and Lieutenant Lightfoot interviewed as to what they were saying and whether or not somebody would corroborate. There was no corroboration. We began, and this is another distinction with Fuller, we began with an investigation that's based on rumor from an anonymous source. We don't even have a person saying, I heard this and you need to look into this, including Lieutenant Evans. She didn't know if it happened. She says in her own report or investigation, if this is something that happened, then she says specifically, and this is on the record at 155, should these assertions be true, they are violations of the administrative section of harassment, as well as department policies and procedures and possibly crimes. So first of all, we're trying to determine whether the allegations are true. In Fuller, you have an accused, an accuser, specific acts that can be corroborated if the investigator, who happened to be a male and part of the police command structure, had followed up on some of that evidence. That didn't happen in Fuller. But the universe of suspects here is pretty small. Yeah, but as we go through those suspects, okay, we start there. And so the one way of doing it, I mean, let's say this had been theft of property, which it wasn't, but let's say that's what had been, you would think of what you'd do is you'd say there's seven possible suspects. We'll sit down and talk to each of them separately and ask them, hey, did you take the property? Why wasn't the appropriate thing here to do and say, look, we've heard reports that some of you guys have made statements like this. Did you do it? Did you do it? Did you do it? And, you know, when confronted with stuff like that, people sometimes are reluctant to lie, particularly when they know that other people may have heard it and they could get into trouble for lying. So why isn't the appropriate and the simplest thing to do is to sit down with each of them separately and ask them hard questions. And the questions that were asked of Sue Utterback and by Lieutenant Lightfoot were asked to the people they knew about. So that universe was, in fact, covered. And, you know, if we go beyond, one of the questions that you asked earlier was, what if she would have talked to them? Excuse me, what would they have said? Well, there was an IA investigation that was ongoing, and they were talked to, and they all denied it. I'm sorry, what's an IA investigation? There was an IA investigation. Internal Affairs? Yes, the Internal Affairs. Was the result of an Internal Affairs investigator communicated to Sue Utterback? It was a year later because, again, it was a matter of they pretty much investigated the entire department. They talked to everybody, followed leads, tried to track those anonymous pages. I'm sorry, what is an IA investigation that's different from this investigation? The Internal Affairs investigation was done by the police department, and that's why Lieutenant Lightfoot, who was at the time the Internal Affairs investigator, he was part of the investigation too because, obviously, there are allegations against the police officer. So am I taking from what you're saying that that is why Utterback did not talk to the two people involved because it was an IA investigation ongoing? No, there were two reasons why she didn't talk to the specific officers. She had every intention of talking to those officers, and those officers, they were sergeants and above, so they were protected by the police officer's Bill of Rights. So when Sue Utterback told Lieutenant Lightfoot, I want to talk to them next, he's saying, well, you can't do that until we go through certain processes, such as they get to have counsel, notice an opportunity to be heard, and so that's what they were going to do. Now, Lieutenant Lightfoot had set up those meetings, and he testified about this during the trial, again, during the plaintiff's case, that he had set up those meetings, and then there was a change in counsel, so it pushed back the time limit, which is, again, another reason why it took Sue Utterback four months to complete this investigation. There was setting up schedules between the officers, because, of course, we're talking about different shifts, and then setting up with their attorneys. So by the time, you know, the clock kept ticking and Sue was getting uncomfortable that things weren't moving along, so she says, okay, if I talk to them and they say I didn't do it, I still don't believe that. I'm going to go ahead and accept this. Accepting that is true. Do I have sexual harassment? And her focus then was on was this something that would substantially interfere with Lieutenant Evans' performance, and that's what she testified to. That's what she said. I talked to Lieutenant Evans. She obviously appeared upset about it, but I had no indication that she had, you know, that this had affected her performance, going back to that window in September when this all is supposed to have allegedly happened. She says she wasn't here. Now, again, as you mentioned before, did Sue make a mistake in interpreting what she saw? I mean, she was reading synopses of the law in employment letters, and that's what she says. You know, in that case, the lady wasn't there, and the court found that there was no sexual harassment, so I think this is similar. Right or wrong, it's not a gender issue. She doesn't go in and say, I'm out to find against Lieutenant Evans. When she concluded her investigation, you asked Judge Kaczynski, why didn't she recommend this? Why didn't she do that? She knew the IA investigation was ongoing. And one of the things that she says is that, and this is at the record at 183, I understand that the police department is continuing its investigation and will probably bring charges based on the department's SOPs, the standard operating procedures, concerning inappropriate conduct towards a ranking or fellow officer. I feel this is the correct definition. So her charge was to remedy, if I'm wrong, correct me, her to remedy Lieutenant Evans' problem if she needed some relief, and then she was relying, according to your reading of the record, on the IA investigation for possible discipline. Correct. Is that right? Yes, but what they're trying to do is get down to the bottom of it. If she thought there was sexual harassment, she could have recommended discipline. She could have recommended counseling. She had done that in the past. In fact, she's one of the people who gives the training on sexual harassment, and where there have been violations in the past, she has given them that training. Who was her exact employer? She worked for the city of Sparks. She worked for the police department. No, Your Honor. She worked for the city. She was under the city manager. Did she wear a uniform or a badge or anything like that? She did not. Did she go out and enforce the law right along with the officers? Was there anything like that? She had no connection to the police department. Did the police department in any way have anything to do with her salary or her working conditions? None whatsoever, Your Honor. She was independent of the police department. And, again, that's where this case began, when she was sued. She was sued along with John Dodson because John Dodson was the police department. Right. And so, obviously, again, it was a matter of trying to fit his involvement in the investigation as part of a fuller analysis, and it didn't fit in that circumstance. Now, I believe summary judgment should have been granted to Ms. Sutterback at the time, and that's one of the arguments that had been made in the appellant's briefs, is that the district court reversed itself. Well, the district court had an entirely different amount of evidence in front of it when it heard this case. It had been listening to witnesses for just about two weeks before it ruled on the Rule 50A motion. So it had a great deal of evidence before it as to what Sutterback did or did not do. Their hands are not tied on Rule 50A motions just because the motion for summary judgment has been. That's correct, and that's why we renewed our motion. And we had sufficiently more evidence at the time. This is, you know. Were you the one that argued the motion? Yes, I am. One of the other issues that has been raised is that Sue didn't ask certain questions of Lieutenant Evans. Sue Sutterback met with Lieutenant Evans. This issue about long-ignored behavior, they discussed it during an interview, and Lieutenant Evans discussed what had happened in the past, and as she described the events that had happened in the past, one of them did not appear to be sexual harassment, basically somebody's not talking to me or talking to me when we're changing shifts, and the other one was an incident where gestures were made. But she reported to Sutterback and to Lieutenant Leif that that was an issue that happened at the time. I guess it would have been like eight or nine years earlier, and that it was an issue that had been resolved. Are the results of this internal affairs investigation part of this record? Yes, they are. And what happened as a result of the internal affairs investigation to the alleged malefactors in this circumstance? Anything? The one that had been charged more, well, found to have engaged in the most egregious conduct, I believe received a five-day suspension. Other people received reprimands. It was an issue of what was determined to have been found for a specific group of people. And I think it's important for the court to note, too, that the people that are identified in Lieutenant Evans' initial investigation or initial complaint, not all of those people. In fact, one of the people that was punished more severely is not even one of the people that is mentioned in her initial report. So we go to the issue of what did Sue Utterback do, and I think that the district court was absolutely correct. There was no evidence that her investigation was the least bit tainted by gender. You mentioned incompetence. You know, if that's the case, then that's the case. But it had nothing to do with the fact that she was going to rule in favor of a woman against or in favor of the man against a woman because she was somehow trying to be part of the boys or part of a group. This was not a cop groupie. This was, like I said, she was an older woman with grandchildren, and somebody who had been around the block before had done these investigations and had found against the department in the past. That was not an issue for her. The ratification issue is also something that Terry Reynolds testified quite a bit as well. And in his testimony, it was clear that he had not accepted Sue's conclusion as the end-all, be-all of this investigation. He knew there was a problem, and he saw that there was a problem. So he proposed team building. He proposed an outside investigation. And again, Judge Schrader, I think you were the one that asked the question about the timing of that. There was an order. It was May 1999 when the district court issued this order and said, I'm not going to order an outside investigation because it would be unfair to the police department or to the city as far as who is now engaged in litigation. It was a very short window between Sue Utterback's report and this litigation. The NARC charge was filed before the lawsuit was filed. I mean, we're talking less than a one-week window. And one of the first things that they filed when they filed the complaint was a motion for an injunction. That's when they came in and said, we don't want to go to team building. So as the city is thinking, we've got a problem that we need to fix, Evans is blocking it at every turn. You know, they tried to do the investigation, and when the court told them, you don't have to do it because it might be prejudicial to you, that's what they did. They knew before the lawsuit was filed that the lawsuit was coming because they had already heard from Evans' counsel. So to say that they took a defensive posture and it was, you know, several months or several weeks later, that is not an accurate statement of the record. I'd like to say something about your prosecution. I guess I should before my time is up. One of the – well, the primary issue there is that the relief that was sought in the injunction was not the relief that was attained after everything was said and done. One of the key things that they focus on, obviously, is, hey, well, we wanted to stop the team building, and that's what we did. Well, that doesn't change the legal relation of the parties. The issue that the police department was told, well, you know, you can't stop her from disciplining employees. Nobody had ever stopped her from disciplining employees. The only issue was she wanted to discipline somebody who had complained about her, and Deputy Chief Cowman testified, we don't discipline employees for complaining about us. We try to fix the complaint. That was the issue. So the court said, okay, well, if you're doing it, stop it, basically, because there was never any finding that Deputy Chief Cowman had disciplined or told somebody don't, you know, or told Evans don't discipline employees. So, you know, we get down to was there a change in the legal relationship of these parties by that injunction, and no, there was not. What they want to – So the district court must have thought there was. Well, no. What the court found – well, I think one of the main things – and that's a good point, Judge Kaczynski. One of the main things that I think the district court found was they were focusing on the catalyst theory. This lawsuit created this change, and basically one of the changes, in fact, was the change in the policy. The policy had changed, and it had been redistributed. And so what the district court is looking at is, look, that happened as a result of this lawsuit, and therefore it helps the department, and therefore it was a catalyst, and therefore I think that something has happened. But I think what the district court neglected to see was that we had already started that process before the injunction was issued. Now, if you're going from, is it because of the lawsuit, then that's one story. But the question was, did the injunction change and get that ball rolling? And I would say that, no. The record is fairly clear from Sue Utterback's testimony that the process of changing the sexual harassment policy had started before the injunction was issued, and I think that's fairly clear from the record. So that didn't truly change the legal relationship of the parties. The remedies that were actually given to Judge or to Evans were so minute, so insignificant in comparison to what she sought, that this was not a situation where she should have been compensated as a prevailing party. She was not a prevailing party in that respect. And so I think that the grant of fees in that instance was error. Okay. Thank you. Any other questions? I think. Thank you, Your Honor. Okay. We've got a minute and ten seconds. I want to briefly address the IA investigation, if I could. First, I'd like to know if you dispute anything that your opposing counsel said about Sue Utterback. She works for the city. She doesn't work for the police department. The police department has no control over any of her working conditions or promotion or salary or anything else. Is that, do you dispute that? We don't dispute that. But Sparks is tiny. They all interrelate. It's not the city of San Francisco. It's a very tiny little city. Is that an actual finding on the record, Sparks is tiny? Yes. No, I'm sorry, Your Honor. Let me talk about this IA investigation for just a second. The IA investigation began at the same time that Sue Utterback's investigation began. The IA investigator testified. He had nothing to do with sexual harassment, sexual discrimination. He never studied Title VII. What did he have to do with? It had to do with the policies, whether people were being rude to each other. Well, it's the same thing. It's labels. Well. Because I'm not a lawyer. I'm just, you know, whether it was or whether it wasn't, we're going to deal with it in terms of just conduct unbecoming to this police department and officers. Well, we think it was more than that. We would concede, Your Honor, that if there was a working together between Utterback and Lightfoot who did the investigation, there might not have been a problem here. But Utterback testified on the stand. She never spoke to Lightfoot after the investigation was over. What about if they were planning to talk to some of the alleged bad guys? There was nothing to stop her from doing that, and she testified. She could have done it at any time. That's a complete red herring. Well, but if you hear that. By the Peace Officers Bill of Rights, were lawyers brought into the whole thing? They are routinely. It's nothing. All you have to do is set up an appointment. And she says all the departments are going to push the trial. So I just assume that they did. No. She changed her theory at trial. She was all over the place. She said that there wasn't enough specific evidence, and she didn't know. But what I wanted to get at was Utterback finished her investigation in January of 99. She never spoke with Lightfoot again. She never communicated any urgency that he finish his report. Hey, this work environment is terrible. We've got to give some relief to Tammy Evans. Finish it up. The IA investigation took a year, a full year. There was no concern. We had to get it done. It was tiny, and everybody worked together. Just let me make one little point, a little teeny one here. The court had to order the IA investigation after a year to finally be finished. They were not working together. There was no conjunction between Utterback did her investigation, which was only about sexual harassment, finished it, closed the book, over and out. The other one continued. It might be continuing to this day if the judge hadn't ordered after a year they finally resolve that IA investigation. Five officers were given a slap on the wrist. They were given the lightest possible penalty, which was don't do this again, what's called a verbal reprimand. One guy was given five days off. He appealed it, and it stood it. And that may be true, but yesterday we had a whole bunch of cases where people got heavy discipline, and so they sued. The discipline was too much. It's because you disciplined me because I was X, Y, or Z. So you're sort of caught between a rock and a hard place on these things. Well, we appreciate the problem that these employers find themselves in. If they fail to do something one way, they get sued. If they do too much the other, they get sued the other way. So there's got to be some play in these. I don't care if everything ends up in court. There was a lot of play and a lot of things that Utterback could have done. She said she could have done, and she said nothing was necessary. It's a matter of whether you can see that there's something that needed to be done in that work environment. It's been our position that work environment was horrendous, that once Sue Utterback wrote her report and acknowledged all this bad language was going on directed at Tammy Evans, it was time for someone to do something. They let it go a full year. But you ruled against her on most of those things. And I think part of that was because in the middle of trial, Sue Utterback left, and the judge said all claims against her are dismissed. And she walked out, and he explained to the jury that she did nothing wrong. I think that really, you know, who knows why a jury is going to reach the conclusions that they reach. We were surprised. Okay. On that note, this case is over two minutes, and we are adjourned. Okay, guys.
judges: B. Fletcher, Kozinski, Trott